**MR. CHOW OF NEW YORK,**
**Plaintiff-Appellee,**

v.

**STE. JOUR AZUR S.A., Henri Gault**
**and Christian Millau,**
**Defendants-Appellants.**

**No. 519, Docket 84–7198.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 17, 1984.
Decided March 28, 1985.

Richard Kent Bernstein, New York City (Richard K. Bernstein Associates, New York City, of counsel), for defendants-appellants.

Kenneth E. Warner, New York City (Richard A. Greenberg, Marjorie M. Smith, Coblence & Warner, New York City, of counsel), for plaintiff-appellee.

Henry R. Kaufman, New York City (Sam Antar, Griffith W. Foxley, New York City, for American Broadcasting Companies, Inc.; R. Bruce Rich, Weil, Gotshal & Manges, New York City, for Association of American Publishers; Ronald E. Guttman, Associate General Counsel, CBS Inc., New York City, for CBS Inc.; Michael N. Pollet, Karpatkin Pollet Perlmutter & Beil, New York City, for Consumers Union of United States, Inc.; Peter C. Gould, Sabin, Bermant & Blau, Barbara Ann Cook, Asst. General Counsel, McGraw-Hill, Inc., New York City, for Magazine Publishers Association; Henry L. Baumann, Steven A. Bookshester, Washington. D.C., for National Association of Broadcasters; J. Marshall Wellborn, Jr., New York City, for National Broadcasting Company, Inc.; Marjorie Coleman, New York City, for New York News Inc.; Harry M. Johnston, III, Robin Bierstedt, New York City, for Time Incorporated; Martin Messinger, Rosalyn D. Young, New York City, for Westinghouse Broadcasting and Cable, Inc., of counsel), for amici curiae, American Broadcasting Companies, Inc., Association of American

Publishers, CBS Inc., Consumers Union of United States, Inc., Magazine Publishers Association, National Association of Broadcasters, National Book Critics Circle, National Broadcasting Company, Inc., New York Drama Critics Circle, New York Film Critics, New York News Inc., Mimi Sheraton, Time Incorporated and Westinghouse Broadcasting and Cable, Inc.

Before MESKILL, KEARSE and CARDAMONE, Circuit Judges.

MESKILL, Circuit Judge:

Appellants Ste. Jour Azur S.A., Henri Gault and Christian Millau appeal from a judgment entered in the United States District Court for the Southern District of New York after a four day jury trial before Griesa, *J.* The jury returned a general verdict against appellants, finding that a restaurant review published by Ste. Jour Azur S.A. in the *Gault/Millau Guide to New York* had libeled appellee Mr. Chow of New York. The jury awarded $20,000 in compensatory damages and $5 in punitive damages. The district court denied appellants' motion for a judgment notwithstanding the verdict and entered judgment in favor of appellee.

For the reasons that follow, we vacate the judgment and remand with instructions to dismiss the complaint.

BACKGROUND

Ste. Jour Azur S.A. (Ste. Jour), a French corporation, is the publisher of a restaurant guide called *Gault/Millau Guide to New York* (Guide). Henri Gault and Christian Millau are the Guide's editors and are also shareholders in Ste. Jour. In April 1981, the Guide published, in French, a review of Mr. Chow, a restaurant located in New York City which specializes in Chinese cuisine. The review was written by Yves Bridault, a French journalist who had previously written reviews for the Guide. Bridault wrote his review based on his dining

experience at Mr. Chow on December 18, 1980. Because of its importance to the resolution of the issues before us, we reproduce in its entirety an English translation of the review.[1]

Mr. Chow
324 E. 54th Street
(between 1st and 2nd Avenues)
(751–9030)
Every day until 11:45

Still another Chinese restaurant, but this one is the latest darling of fashionable society. Until the middle of the night "beautiful people" of all sorts crowd into this huge and very noisy room whose two levels bring back with brio the era of the (Western) 1930s with the customary array of walls lacquered black and beige, indirect lighting and banisters of gilded metal. Their ambition, apparently, is more to be seen in this superb decor than to eat Chinese style. While his London restaurant enjoys an honorable reputation (although it is clearly overrated) the branch which the clever Mr. Chow has just opened in New York is simply astounding from a culinary point of view. In a pinch, you might not care that you have to wait ten minutes to obtain chopsticks instead of forks, that it is impossible to have the basic condiments (soy sauce, hot sauce, etc.) on the table, that the principal concern of the waiters (Italians) is to sell you expensive alcoholic drinks, but the last straw is that the dishes on the menu (very short) have only the slightest relationship to the essential spirit of Chinese cuisine. With their heavy and greasy dough, the dumplings, on our visit, resembled bad Italian ravioli, the steamed meatballs had a disturbingly gamy taste, the sweet and sour pork contained more dough (badly cooked) than meat, and the green peppers which accompanied it remained still frozen on the plate. The chicken with chili was rubbery and the rice, soaking, for some reason, in oil, totally insipid. Had we been specially punished for be-

1. This translation which was attached to the plaintiff's complaint is the one prepared by Dr. Joseph, a witness for Mr. Chow. It is not the version that appears in the English version of the Guide.

ing so pretentious as to drink only tea? Apparently not, for the drinkers of alcohol seemed as badly off as we. At a near-by table, the Peking lacquered duck (although ordered in advance) was made up of only one dish (instead of the three traditional ones), composed of pancakes the size of a saucer and the thickness of a finger. At another table, the egg-rolls had the gauge of andouillette sausages, and the dough the thickness of large tagliatelle. No matter, since the wine kept flowing. We do not know where Mr. Chow recruits his cooks, but he would do well to send them for instruction somewhere in Chinatown. There, at least, they still know the traditions. It is, however, true, that when one sees with what epicurian airs his customers exclaim at canned lychees, one can predict for him a long and prosperous life uptown. About $25, without the drinks.

On February 19, 1982 Mr. Chow of New York, the joint venture that owns Mr. Chow, commenced the instant action. In the complaint, Ste. Jour, Gault and Millau were named as defendants and jurisdiction was based on diversity of citizenship. The complaint alleged that the review contained false and defamatory statements and sought compensatory damages in excess of $10,000 and punitive damages in excess of $250,000.

At trial, appellee's main witnesses were Dr. Lawrence Joseph, Michael Chow, Sik Chung Lam and Kooh Hong Kim. Dr. Joseph, a professor of French language and literature at Smith College, testified that he had translated the French version of the review into the English version. He also gave testimony concerning the accuracy of his translation of the phrase "the green peppers ... remained still frozen on the plate." Michael Chow, the founder of Mr. Chow, testified about food preparation at Mr. Chow, the traditional number of dishes in Peking Duck and the damages suffered by Mr. Chow. Sik Chung Lam, head chef at Mr. Chow, testified about the preparation of certain dishes at Mr. Chow and authenticated a video tape recording of the chefs at Mr. Chow preparing sweet and sour pork, green peppers and fried rice. Kooh Hong Kim, flour chef at Mr. Chow, also testified about the preparation of certain dishes at Mr. Chow and gave a live demonstration of his method of making Chinese pancakes.

Appellants called as witnesses Yves Bridault, Raymond Sokolov and Christine Bridault. Mr. Bridault, the reviewer, testified about his approach to writing reviews and the events surrounding his visit to Mr. Chow. Mr. Sokolov, a New York restaurant reviewer, testified about writing restaurant reviews generally, about the reputation of the Guide and about a negative dining experience he had had at Mr. Chow. Christine Bridault testified that she had accompanied her husband to Mr. Chow and that his review was an accurate description of their experience.

The district court submitted six statements to the jury. It instructed the jury that, as a matter of law, these were statements of fact and that if any one of them was false, defamatory and made with malice it would support a finding that the review had libeled Mr. Chow. The six statements submitted were:

(1) "It is impossible to have the basic condiments ... on the table."

(2) "The sweet and sour pork contained more dough ... than meat."

(3) "The green peppers ... remained still frozen on the plate."

(4) The rice was "soaking ... in oil."

(5) The Peking Duck "was made up of only one dish (instead of the traditional three)."

(6) The pancakes were "the thickness of a finger."

The jury returned a general verdict, finding that the review was libelous. It awarded $20,000 in compensatory and $5 in punitive damages. Appellants' motion for judgment notwithstanding the verdict was denied without opinion.

### DISCUSSION

On appeal, appellants raise a host of grounds for reversal. Among them are a

claim that the statements submitted to the jury are opinion and thus protected speech and a claim that the evidence on the issue of malice is insufficient to support the jury's findings. Because we find these two claims dispositive of this appeal, we do not consider appellants' other claims.[2]

### A. *Opinion*

Appellants' initial argument is that the district court erred when it failed to hold that the statements submitted to the jury were opinion and thus privileged. Appellants' argument stems from the Supreme Court's decision in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), where the Court stated:

> We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

*Id.* at 339–40, 94 S.Ct. at 3006–07 (footnote omitted). We have recognized that *Gertz* made crucial the distinction between statements of fact and opinions. *See, e.g., Buckley v. Littell*, 539 F.2d 882, 893 (2d Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 776 (1977). And, we have held that generally one cannot be liable simply for expressing an opinion. *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir.), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977).

The Supreme Court has also made clear that the constitutional protection afforded statements of opinion is not lost simply because the opinion is expressed through the use of figurative or hyperbolic language. In *Greenbelt Cooperative Publishing Assn. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), a newspaper had reported that plaintiff had been characterized as "blackmailing" the city in connection with negotiations to obtain zoning variances. The Court held that the statement could not be read literally. "On the contrary, even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [plaintiff's] negotiating position extremely unreasonable." *Id.* at 14, 90 S.Ct. at 1542. Thus, the Court reversed the libel judgment that had been based on the statement.

The Court reached a similar result in *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).[3] In *Old Dominion*, the defendant labor union had called the plaintiff a scab and quoted a statement attributed to Jack London that defined a scab as "a traitor to his God, his country, his family and his class." *Id.* at 268, 94 S.Ct. at 2773. The Court found that the use of the word "traitor" was not a representation of fact. Rather, "[s]uch words were obviously used here in a loose, figurative sense.... Expression of such an opinion, even in the

---

2. Appellants also challenge the proof of falsity, the proof of damages, the liability of Ste. Jour and Gault and a number of evidentiary rulings, particularly the admission of the video tape reproduction of the Mr. Chow chefs at work and the in-court demonstration of the preparation of pancakes. We do not consider any of these arguments. However, we do note that in circumstances such as this, the district court should carefully consider the concerns of Fed.R. Evid. 403 before admitting evidence such as the video tape reproduction and the live demonstration.

3. Although *Old Dominion* involved the application of federal labor law, the Court's analysis drew heavily from *Gertz* and other First Amend-

ment/defamation cases. The courts of appeals have frequently interpreted the *Old Dominion* decision as supplying First Amendment standards. *See, e.g., Ollman v. Evans*, 750 F.2d 970, 976 (D.C.Cir.1984) (en banc); *see also id.* at 999 n. 4 (Bork, *J.,* concurring); *Lauderback v. American Broadcasting Cos.*, 741 F.2d 193, 197 (8th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985); *Pring v. Penthouse International*, 695 F.2d 438, 440 (10th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3112, 77 L.Ed.2d 1367 (1983); *Street v. National Broadcasting Co.*, 645 F.2d 1227, 1232 (6th Cir.), *cert. dismissed per stipulation,* 454 U.S. 1095, 102 S.Ct. 667, 70 L.Ed.2d 636 (1981).

most pejorative terms, is protected...." *Id.* at 284, 94 S.Ct. at 2781. The Court concluded by noting that "London's 'definition of a scab' is merely rhetorical hyperbole, a lusty and imaginative expression of ... contempt." *Id.* at 285–86, 94 S.Ct. at 2781–82.

 Although it is clear that expressions of opinion are constitutionally protected, the determination of whether a specific statement is one of opinion or fact is difficult. As an initial matter, the inquiry into whether a statement should be viewed as one of fact or one of opinion must be made from the perspective of an "ordinary reader" of the statement. *Buckley v. Littell,* 539 F.2d at 894. It is also clear that the determination of whether a statement is opinion or rhetorical hyperbole as opposed to a factual representation is a question of law for the court. *Davis v. Ross,* 754 F.2d 80, 85 (2d Cir.1985); *Ollman v. Evans,* 750 F.2d 970, 978 (D.C.Cir.1984) (en banc); *Lauderback v. American Broadcasting Cos.,* 741 F.2d 193, 196 n. 6 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985); *Lewis v. Time Inc.,* 710 F.2d 549, 553 (9th Cir.1983); *Rinsley v. Brandt,* 700 F.2d 1304, 1309 (10th Cir.1983); *Church of Scientology v. Siegelman,* 475 F.Supp. 950, 955 (S.D.N.Y. 1979); *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 381, 366 N.E.2d 1299, 1306, 397 N.Y.S.2d 943, 950, *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977). Beyond this point, however, the law in this area is murky.

We have had occasion to examine this area in several recent decisions. In *Buckley v. Littell,* our first post-*Gertz* decision, the district court had found that the book *Wild Tongues* by Franklin Littell libeled William F. Buckley, Jr. in three respects:

[F]irst, by labeling Buckley as a "fellow traveler" of "fascism" as those terms are defined in Wild Tongues ...; second, by saying that he acts as a "deceiver" and uses his journalistic position to spread materials from "openly fascist journals" under the guise of responsible conservatism ...; and third, by accusing Buck-

ley of engaging in the same kind of libelous journalism as Westbrook Pegler practiced against Quentin Reynolds.

539 F.2d at 887 (citations omitted). On appeal, we determined the first two statements to be protected opinion.

With respect to the statement that Buckley is a fellow traveler of fascism, we viewed the concept conveyed to be "loose," "varying" and "insusceptible to proof of truth or falsity." *Id.* at 894. Thus, when viewed in the context in which it was made, the statement was "within the realm of protected opinion and idea under *Gertz*." *Id.* We also held that the statement that Buckley printed " 'news items' and interpretations picked up from the openly fascist journals" was "as much a matter of opinion or idea as is the question what constitutes 'fascism' or the 'radical right.' " *Id.* at 895. Thus, the statement could not support a libel action.

Turning to the statement that "[l]ike Westbrook Pegler, who lied day after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and nothing else to do," we determined that this statement was an assertion of fact; specifically, that Buckley had lied about and libeled several people. *Id.* We noted that "Littell must have known that when he directly compared Buckley's statements with those of a proven libeler, the clear meaning to be inferred was that he considered Buckley to be a libeler like Pegler." *Id.* at 896. Thus, unlike "the loosely definable, variously interpretable statements" referred to above, the statement that Buckley was engaging in libelous journalism was a factual assertion that, if false and made with actual malice, could support a libel action. *Id.* at 895–96.

We next examined the constitutional distinction between statements of opinion and statements of fact in *Hotchner v. Castillo-Puche.* In *Hotchner,* Doubleday & Company was found liable for statements made about A.E. Hotchner in a book published by

Doubleday entitled *Hemingway in Spain.* The statements described "Hotchner as a manipulator, a 'toady,' a 'hypocrite' who exhibited 'two-faced behavior' toward Hemingway's true friends and 'put up a very good front as [Hemingway's] mild-mannered, obedient servant,' an 'exploiter of [Hemingway's] reputation' who was 'never open and above board.'" 551 F.2d at 912.

In analyzing Doubleday's liability, we recognized that "[a]n assertion that cannot be proved false cannot be held libellous. A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be." *Id.* at 913. But, we also recognized that there is an exception to this general rule. We stated:

> Liability for libel may attach, however, when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader. If an author represents that he has private, first-hand knowledge which substantiates the opinions he expresses, the expression of opinion becomes as damaging as an assertion of fact.

*Id.* Because we found no evidence to indicate that Doubleday had reason to suspect that the author's opinion of Hotchner were based on privately known, untrue facts we reversed the judgment against Doubleday. *Id.* at 914.

We again examined the distinction between opinion and fact in *Edwards v. National Audubon Society,* 556 F.2d 113 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). In *Edwards,* the district court had found a portion of a letter written by Roland Clements, an officer and employee of the Audubon Society, to the New York Times libelous per se. Included in the letter was the following

statement: "Nor do we like to call people liars, but those who have most consistently misused our data—[list of individuals, including plaintiffs]—certainly have had time to learn from our patient explanations of their misinterpretations of our data over the several years of the DDT controversy." *Id.* at 119. Looking to the context in which the epithet "liar" was used, we held that it "merely expressed the *opinion* that anyone who persisted in misusing Audubon statistics after being forewarned could not be intellectually honest. Since the basis for this opinion was fully set forth, the communication of Clements' views cannot be libelous, however mistaken they might be." *Id.* at 121.[4]

More recently, in *Cianci v. New Times Publishing Co.,* 639 F.2d 54 (2d Cir.1980), we held that a statement alleging criminal conduct fell outside of the constitutional protection afforded opinion. At issue in *Cianci* was an article that charged Vincent Cianci, Jr., then seeking reelection as mayor of Providence, Rhode Island, with raping a woman at gunpoint and subsequently paying her $3,000 to drop rape charges. We determined that the charges made against Cianci were leveled in a literal sense and were not the use of undefinable language or rhetorical hyperbole, stating that to call the charges "merely an expression of 'opinion' would be to indulge in Humpty-Dumpty's use of language." *Id.* at 64. Thus, we held that direct accusations of criminal misconduct, even when the underlying facts are disclosed, are not protected as opinion. *Id.* at 65. *Accord Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d at 381–82, 366 N.E.2d at 1307, 397 N.Y.S.2d at 951.

■ Although none of these four decisions can be said to establish an actual test for determining if a statement is protected

---

**4.** In *Edwards,* we distinguished the epithet "liar" from the epithet "paid liar." We found that unlike calling someone a liar, charging someone with being a paid liar was an assertion of fact. We explained:

> [T]o call the appellees, all of whom were university professors, *paid* liars clearly in-

volves defamation that far exceeds the bounds of the prior controversy. . . . And, to say a scientist is *paid* to lie implies corruption, and not merely a poor opinion of his scientific integrity. Such a statement requires a factual basis. . . .

556 F.2d at 121 n. 5.

opinion or unprotected fact, they do provide guidance. Thus, it is clear that we must examine both the context in which the statements are made and the circumstances surrounding the statements. *See Edwards,* 556 F.2d at 121; *Buckley,* 539 F.2d at 893–94. We must also look at the language itself to determine if it is used in a precise, literal manner or in a loose, figurative or hyperbolic sense. *Cianci,* 639 F.2d at 64; *Buckley,* 539 F.2d at 893–94. Related to this inquiry, we must examine the statements to determine if they are objectively capable of being proved true or false. *Hotchner,* 551 F.2d at 913; *Buckley,* 539 F.2d at 894. Finally, if the above analysis indicates that the statement is opinion, we must determine if it implies the allegation of undisclosed defamatory facts as the basis for the opinion. *Davis,* at 85–86; *Cianci,* 639 F.2d at 64–65; *Hotchner,* 551 F.2d at 913.[5]

In the recent *en banc* decision of the D.C. Circuit in *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984), Judge Starr, writing for the court, developed a similar guide to aid in the determination of whether the average reader would view a statement as one of fact or one of opinion. Judge Starr listed four factors that should be considered.

■ First, a court should analyze "the common usage or meaning of the specific language" used in the challenged statement. *Id.* at 979. Such an analysis is helpful because the average reader is "considerably less likely to infer facts from an indefinite or ambiguous statement than one with a commonly understood meaning." *Id.* Second, a court should consider whether the statement is "objectively capable of proof or disproof." *Id.* at 981. This analysis is important because "[l]acking a clear method of verification ... the trier of fact may improperly tend to render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject." *Id.* Third, a court should examine the immediate context in which the statement is made. *Id.* at 982. "The language of the entire column may signal that a specific statement which, standing alone, would appear to be factual is in actuality a statement of opinion." *Id.* Finally, the court should examine "the broader social context into which the statement fits," *id.* at 983, and "the different social conventions or customs inherent in different types of writing." *Id.* at 984. This inquiry recognizes that "[s]ome types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact." *Id.* at 983.

■ Turning to the instant case, we believe that application of the guidelines culled from our previous opinions and Judge Starr's opinion in *Ollman* mandates a holding that five of the six statements submitted to the jury were opinion rather than fact. Only the statement that Mr. Chow served Peking Duck in one dish rath-

---

5. The Restatement (Second) of Torts provides a similar exception to the protection afforded opinion. Section 566 states:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

The Eighth Circuit has recently examined the rationale behind this exception:

> While the right of free speech provides absolute protection to statements which are purely opinions, *Gertz v. Welch,* 418 U.S. at 339–40, 94 S.Ct. at 3006–07, it is conceded that statements clothed as opinion which imply that they are based on undisclosed, defamatory facts are not protected. This stricture on publication of opinion rests on the assumption

that, given all the facts of a situation, the public can independently evaluate the merits of even the most outrageous opinion and discredit those that are unfounded. On the other hand, when an opinion held out for belief is stated so that the average listener would infer that the speaker had an undisclosed factual basis for holding the opinion, the listener does not have the tools necessary to independently evaluate the opinion and may rely on unfounded opinion that defames an individual.

*Lauderback,* 741 F.2d at 195–96. Although there may be situations where this exception is applicable to a restaurant review, Mr. Chow does not contend that it should be invoked in the instant case. Thus, we will not consider its applicability to the case before us.

er than the traditional three can be considered factual.

### 1. *Context*

As indicated earlier, both the immediate and broader context in which a statement occurs can indicate that what appears to be a statement of fact is in reality protected opinion. The opinion of the Massachusetts Supreme Court in *Myers v. Boston Magazine Co.*, 380 Mass. 336, 403 N.E.2d 376 (1980), is a clear example of such a situation. In *Myers*, a sports announcer sued over a statement that appeared in a magazine section entitled "Best & Worst: SPORTS." The section named Myers as the worst sports announcer, stating that he was "[t]he only newscaster in town who is enrolled in a course for remedial speaking." *Id.* at 338, 403 N.E.2d at 377. Looking to the entire context, the court concluded that it was clear that the statement was opinion. It stated:

> The "Best and Worst" format invites the reader to test his opinions against the author's. Some of the recipients of the "awards" may have been so interested as to take them seriously, but the reasonable reader could only approach the article with a measure of scepticism and an expectation of amusement. Neither of these predispositions is conducive to misunderstanding a joke as a statement of fact.

*Id.* at 342, 403 N.E.2d at 380.

Similarly, in *Mashburn v. Collin*, 355 So.2d 879 (La.1977), the Supreme Court of Louisiana found the context in which critical remarks about a restaurant were made to indicate that the statements were protected opinion. Among the statements alleged to be defamatory were the following: "the piece de resistance that turns [the stuffed eggplant] into a gourmet dish is to empty a shaker full (more or less) of paprika on top of it;" the sauce on the duck was "yellow death on duck;" and the poached trout should be named "trout a la green plague." *Id.* at 888. The court stated that taken by themselves these statements "would appear to be allegations of fact." *Id.* at 889. However, it held that "[i]n the final analysis, when we read the entire piece of criticism to determine how ordinary reasonable persons hearing or reading the statements would be likely to understand them, we find that they would be regarded as expressions of the writer's opinion, and not as statements of fact." *Id.*[6]

Likewise, the court in *Ollman* relied on the context in which the disputed statements were made to support its conclusion that the statements would be recognized as opinion. The statement at issue appeared in a column on the Op-Ed page of a newspaper. The court stated that Op-Ed pages are the well recognized home of opinion and comment and thus the average reader will be influenced to read statements located there as opinion. *Ollman*, 750 F.2d at 986–87.

Restaurant reviews are also the well recognized home of opinion and comment. Indeed, "[b]y its very nature, an article commenting upon the quality of a restaurant or its food, like a review of a play or movie, constitutes the opinion of the reviewer." *Greer v. Columbus Monthly Publishing Corp.*, 4 Ohio App.3d 235, 238, 448 N.E.2d 157, 161 (1982). The natural function of the review is to convey the critic's opinion of the restaurant reviewed: the food, the service, the decor, the atmosphere, and so forth. Such matters are to a large extent controlled by personal tastes. The average reader approaches a review with the knowl-

---

**6.** We briefly discussed *Mashburn* in *Cianci*. In reaching its result the *Mashburn* Court discussed Restatement (Second) of Torts § 566 (1977), *see* n. 5 *supra*. In *Cianci*, we stated:

> Another opinion which cited § 566 with approval, but has no bearing on the instant case, is *Mashburn v. Collins* [sic], 355 So.2d 879 (La.1977), which involved a detailed adverse newspaper review of the cuisine at a newly opened restaurant, This again was a matter of opinion which would ultimately be resolved by the taste buds. If the review had claimed that the restaurant had used condemned food or was in violation of sanitation laws, the result could and, in our view, should have been different.

639 F.2d at 65 n. 14.

edge that it contains only one person's views of the establishment. And importantly, "[a]s is essential in aesthetic criticism ... the object of the judgment is available to the critic's audience." *Myers*, 380 Mass. at 341, 403 N.E.2d at 379. Appellee does not cite a single case that has found a restaurant review libelous. Appellants and *amici*, on the other hand, cite numerous decisions that have refused to do so.[7] Although the rationale underlying each of these decisions is different, they all recognize to some extent that reviews, although they may be unkind, are not normally a breeding ground for successful libel actions.

## 2. *Language Used*

Recognizing that reviews are normally conveyors of opinion, we turn to the language in the review before us to see if it makes factual representations. Examining the language in the review itself, we cannot say that it would cause the average reader to believe that the writer in five of the six contested remarks had gone beyond statements of opinion. It is clear that the writer's statements would be protected if he had merely said: I found it difficult to get the basic seasonings on my table. The sweet and sour pork was too doughy for my tastes. The green peppers served with the pork were not hot enough. The fried rice was too oily. And the pancakes served with the Peking Duck were too thick. The question thus becomes, did the writer's use of metaphors and hyperbole turn his comments into factual statements. We believe that it did not.

The protection afforded exaggerated or hyperbolic language stems from the Su-

preme Court's *Greenbelt* decision where the Court held that non-actionable statements do not become actionable merely because they are expressed in the form of rhetorical hyperbole. As the Fourth Circuit has said: "To deny to the press the right to use hyperbole ... would condemn the press to an arid, desiccated recital of bare facts." *Time, Inc. v. Johnston*, 448 F.2d 378, 384 (4th Cir.1971).

The above principle has been applied to reviews. For example, in *Mashburn*, the court recognized that the use of mock praise or hyperbole did not prevent the average reader from viewing the statements involved as expressions of opinion. For example, with respect to the statement about the eggplant, the court stated: "The tenor and context of this remark unmistakably indicate that it is an example of hyperbole which meant merely that in the critic's opinion a large amount of paprika unnecessarily had been added to the dish." 355 So.2d at 889.

The *Myers* Court expressed similar sentiments. In *Myers*, the plaintiff argued that the statement was not protected hyperbole or mere rhetorical excess because it lacked popular figurative meaning. The court rejected this argument, stating:

[T]he mere presence of a different kind of figurative language from that found in other cases does not free this case from the claims of the distinction between fact and opinion. If the device here is lacking in art, it is no less figurative than a vague epithet or a soaring metaphor. And it deserves the same protection under the First Amendment.

380 Mass. at 344, 403 N.E.2d at 380–81 (footnote omitted).[8]

7. *See, e.g., Golden v. Elmira Star Gazette*, 9 Med.L.Rep. (BNA) 1183 (N.Y.Sup.Ct. Ontario County 1983); *Greer v. Columbus Monthly Publishing Corp.*, 4 Ohio App.3d 235, 448 N.E.2d 157 (1982); *Kuan Sing Enterprises v. T.W. Wang, Inc.*, 86 A.D.2d 549, 446 N.Y.S.2d 76 (1st Dep't), *aff'd*, 58 N.Y.2d 708, 444 N.E.2d 1008, 458 N.Y.S.2d 544 (1982); *Pritsker v. Brudnoy*, 389 Mass. 776, 452 N.E.2d 227 (1983); *Havalunch, Inc. v. Mazza*, 294 S.E.2d 70 (W.Va.1981); *Ihle v. Florida Publishing Co.*, 5 Med.L.Rep. (BNA) 2005 (Fla.Cir.Ct.1979); *Mashburn v. Collin*, 355

So.2d 879 (La.1977); *Steak Bit of Westbury, Inc. v. Newsday, Inc.*, 70 Misc.2d 437, 334 N.Y.S.2d 325 (Sup.Ct. Nassau County 1972); *Twenty-Five East 40th Street Restaurant Corp. v. Forbes, Inc.*, 37 A.D.2d 546, 322 N.Y.S.2d 408 (1st Dep't 1971), *aff'd*, 30 N.Y.2d 595, 331 N.Y.S.2d 29, 282 N.E.2d 118 (1972).

8. Courts have expressed similar views when invoking the common law doctrine of fair comment. For example, in *Briarcliff Lodge Hotel v. Citizen-Sentinel Publishers*, 260 N.Y. 106, 183

The instant case is similar to *Mashburn* and *Myers*. The Guide is a review known for its "pointed commentary" and for being interesting and fun to read. Tr. at 245. Thus, one would expect the review writer to attempt to use metaphors, exaggeration and hyperbole. Looking at five of the six statements involved: (1) it was "impossible" to get the basic seasonings on the table; (2) the sweet and sour pork contained "more dough than meat;" (3) the green peppers were "still frozen" on the plate; (4) the fried rice was "soaking" in oil; and (5) the pancakes were the "thickness of a finger;" we believe that they are clearly an attempt to interject style into the review rather than an attempt to convey with technical precision literal facts about the restaurant. The author obviously believed that the service was bad, the pork was too doughy, the peppers were too cold, the rice was too oily and the pancakes were too thick. The average reader would understand the author's statements to be attempts to express his opinions through the use of metaphors and hyperbole. Because the average reader would understand the statements involved to be opinion, the statements are entitled to the same constitutional protection as a straightforward expression of opinion would receive.

### 3. *Truth/Falsity*

The final factor that our previous decisions indicate should be examined is whether the statement is objectively capable of being proved true or false. As Judge Starr stated in *Ollman*, "a reader cannot ration-

ally view an unverifiable statement as conveying actual facts." 750 F.2d at 981.

This factor also weighs in favor of determining five of the six statements to be opinion. Only if taken literally can any of the five statements be deemed capable of being proved false. As we have just concluded, however, a reasonable reader would not take these statements literally. Read reasonably, the statements are incapable of being proved false. For example, the proper amount of oil in fried rice is clearly a matter of personal taste. What is too oily for one person may be perfect for some other person. The same can be said for the temperature of vegetables, the thickness of pancakes, the amount of dough in sweet and sour pork and the quality of service.[9] Perhaps Mr. Chow could prove that the reviewer's personal tastes are bizarre and his opinions unreasonable, but that does not destroy their entitlement to constitutional protection.

When viewed in the entire context and given a reasonable rather than a literal reading, only the statement that Mr. Chow served Peking Duck in one dish instead of the traditional three can be viewed as an assertion of fact. The statement is not metaphorical of hyperbolic; it clearly is laden with factual content. Moreover, the statement contains allegations that are seemingly capable of being proved true or false. However, even if we accept the statement as factual and assume that it can be viewed as defamatory,[10] the statement cannot support the judgment entered be-

N.E. 193 (1932), the New York Court of Appeals stated: "Mere exaggeration, slight irony or wit, or all those delightful touches of style which go to make an article readable, do not push beyond the limitations of fair comment." *Id.* at 118–19, 183 N.E. at 198. *See also Havalunch*, 294 S.E.2d at 75–76.

9. We do not include the fact that the food in question has been consumed and is no longer in existence as a factor in determining whether the truthfulness of the statements can be verified. That fact presents an evidentiary problem, however.

10. We do question, however, whether such a statement could have substantially disparaged Mr. Chow's reputation. As *amici* point out, if

the error is clear, it reflects more on Bridault's knowledge than on Mr. Chow's reputation. Moreover, even if this one statement of fact is defamatory and malicious, we would be concerned about allowing Mr. Chow to pin his total loss of profits that allegedly resulted from the review on one relatively minor factual inaccuracy in a review full of protected critical comments. The lost profits may have been caused by the protected statements rather than the unprotected statement. Thus, we would not allow recovery for lost profits without some proof of causation tied to the statement about the Peking Duck.

low. Mr. Chow did not prove that the statement was made with malice.

### B. *Malice*

■ Mr. Chow does not contest its characterization as a public figure for purposes of First Amendment analysis. Thus, before it can recover in libel it must prove that any false statements of fact in the review were made with actual malice. "The burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of United States,* —— U.S. ——, —— n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984).

■ Our role in reviewing a finding of malice is clear.

> The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."

*Id.* at ——, 104 S.Ct. at 1965. After undertaking such an examination of the record, we are convinced that with respect to the one factual statement submitted to the jury the evidence of malice is not clear and convincing.[11]

The only evidence of malice Mr. Chow points to is: (1) the statement that Peking Duck is traditionally served as three dishes is false; and (2) the number of dishes listed in the review as the traditional serving of Peking Duck was changed from five to three by Millau during the editing process. Br. of Mr. Chow at 29–30. Such evidence

is clearly inadequate. Assuming that Bridault and Millau were in error, there is no evidence that supports an inference that they knew or suspected that they were in error.

The most likely explanation of Bridault's confusion over the number of dishes in a traditional serving of Peking Duck came from Michael Chow himself. In a deposition, Bridault had stated that he had eaten at the Peking Duck Restaurant in Peking. Responding to a question about the Peking Duck Restaurant, Michael Chow stated:

> And so when you look at the menu of the Peking Duck Restaurant, soup is made out of duck, all kinds of things made out of duck. So obviously, when you go there, you must have the Peking duck, otherwise there is no point. So when you go there to have the Peking duck, you usually have two or three or five other accompanying dishes to the Peking duck.
>
> And I think Mr. Bridault probably was under the impression when he went, he had three dishes, and he maybe misunderstood that traditionally everybody have three dishes when you have Peking duck, and it's not true.

Tr. at 81. Because of the absence of evidence showing either that Bridault or Millau knew that Peking Duck was not traditionally served as three dishes or that they subjectively entertained serious doubts about the accuracy of the statement that it is traditionally served in three dishes, we cannot say that the existence of malice has been established by clear and convincing evidence. Thus, this statement cannot support the judgment entered below.

### Conclusion

We conclude that five of the six statements submitted to the jury were statements of opinion and thus constitutionally protected. Plaintiff has failed to prove by clear and convincing evidence that the sixth

---

**11.** Because the case comes to us from a general verdict, we cannot be sure that the jury found that this statement was made with malice. For purposes of our review, we will assume that the jury did make such a finding.

statement, even if false and defamatory, was made with actual malice. Moreover, Mr. Chow points to no statements that could support a jury verdict in a new trial. Therefore, the judgment below is vacated and the case is remanded to the district court with instructions to dismiss the complaint.