**POTOMAC VALVE & FITTING INC.;**
**Raymond C. McGarvey,**
**Plaintiffs-Appellants,**

v.

**CRAWFORD FITTING COMPANY;**
**Dibert Valve & Fitting Company,**
**Inc., Defendants-Appellees.**

No. 86–2666.

United States Court of Appeals,
Fourth Circuit.

Argued May 6, 1987.
Decided Sept. 24, 1987.

---

Stephen A. Horvath, Alexandria, Va., for plaintiffs-appellants.

Rodney F. Page, Washington, D.C., and Gary B. Mims, Fairfax, Va., for defendants-appellees.

Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and WISDOM, United States Senior Circuit

Judge for the Fifth Circuit sitting by designation.

WISDOM, Senior Circuit Judge:

This is a diversity suit for damages based upon theories of defamation, civil conspiracy, and violation of Virginia's "insulting words" statute. The district court entered summary judgment for the defendants, and the plaintiffs brought this appeal. Because we find that the principal statement at issue was a constitutionally protected expression of opinion, we affirm.

### I.

The plaintiffs are Potomac Valve & Fitting Inc. (Potomac Valve) and its president and owner, Raymond McGarvey. The plaintiffs distribute "Bi-lok" brand tube fittings in Maryland and Virginia. The defendants are the Crawford Fitting Company (Crawford) and the Dibert Valve & Fitting Company (Dibert Valve). Crawford manufactures "Swagelok" brand tube fittings and Dibert Valve distributes Swagelok fittings in Virginia. Bi-lok and Swagelok are direct competitors in the Virginia tube·fitting market.

In January 1985, Potomac Valve commissioned the Newport News Industrial Corporation (Newport News) to conduct a series of tests in response to customer concerns about whether the Bi-lok fitting was freely interchangeable with the older and more established Swagelok fitting. Mr. McGarvey, himself a former Swagelok distributor, instructed Newport News to use the "Swagelok General Test Program"—with some modifications. The parties disagree sharp-

ly about the importance of these modifications.[1]

On June 24, 1985, Newport News completed the tests and prepared a twenty-nine page report of its findings. Potomac Valve summarized this report in three pages and added a fourth page as a synopsis and cover sheet. The synopsis concluded that Bi-lok, Swagelok, and two lots of intermixed fittings all passed the various tests "with no significant differences". The synopsis and the test results were sent out to the customers and potential customers of Potomac Valve.

All this activity inevitably came to the attention of Samuel Dibert, the President of Dibert Valve. Dibert sent a copy of the synopsis to Crawford headquarters in Ohio. He then attempted to find out about the testing procedures used by Newport News, but officials at Newport News told him that this information was "privileged".

On August 26, 1985, Dibert wrote to one of his customers, the Badische Corp. of Williamsburg, Virginia, and declared that "[t]he test parameters for the recent test by Newport News Shipbuilding were set up by Bi-lok to give the best possible chance of success".[2] Despite this letter, Badische eventually shifted its account from Swagelok to Bi-lok.[3]

Shortly after Dibert mailed the test synopsis to Crawford he telephoned Mr. William Wilson, then Manager of Marketing and Technical Services at Crawford, and the following conversation ensued:

> He called me and said, "Did you get it?," and I said, "Yes," and something to the effect of, "Are you going to do anything about it?," and I said, "I don't know, I've

---

**1.** The defendants maintain that McGarvey improperly supplied Newport News with the fittings to be tested. They also charge that only the strongest sizes and shapes were tested, and that several important tests were omitted altogether. The plaintiffs insist that the only deviations from the Swagelok General Test Program were cost-saving measures that in no way affected the tests' validity. Fortunately we need not pass judgment on these methodological problems to decide the case before us.

**2.** Newport News Shipbuilding is the parent of the Newport News Industrial Corp. which actually conducted the tests.

**3.** It is worth noting that the August 26 letter to Badische also included the following statement:

> We do not question the results of the test, but rather ask if it is appropriate or prudent to use this test of limited service factors, under ideal conditions, to support the claim that the Bi-lok fitting is equal in all respects to SWAGELOK.

In short, the main point of Dibert's letter to Badische was not to impugn the tests themselves, but simply to question their value when set beside Swagelok's "years of proven reliability" under actual operating conditions.

got more important things to do right now."

Wilson deposition at 37. On October 3, 1985, Crawford finally responded to the Bi-lok test with a two paragraph "article" in the Crawford Distributor Information Exchange.[4] The text of this critique was written by Wilson and sent to Crawford distributors across the country. Although the Distributor Information Exchange is marked "Personal and Confidential", Wilson testified in his deposition that he expected Crawford distributors to use it to brief their salesmen, and that ultimately the salesmen would convey the gist of what he had written to any customer who had questions about the test. In the last line of the article, Wilson concludes that "[t]his was a (purposely) very poor test designed to snow the customer".

According to the plaintiffs, Swagelok salesmen began to tell their customers that the Bi-lok test had been rigged. Although they quickly mailed out a two page reply to these accusations, the plaintiffs maintain that as a result of Crawford's conduct they have lost "substantial" business, as well as a distributorship for Cardinal Tubing.

In April 1986 the plaintiffs sued Crawford and Dibert Valve in the Eastern District of Virginia.[5] The plaintiffs allege that Crawford and Dibert Valve conspired to injure them in their reputation; they also maintain that both the August 26 letter to Badische and the Crawford Distributor Information Exchange constitute defamation and violate the Virginia statute that prohibits insulting words which "tend to violence and breach of the peace".

After discovery, the district court granted the defendants' motion for summary judgment on all counts. The court found that the Distributor Information Exchange, even if defamatory, was privileged as a communication between parties sharing a common business interest.[6] In the alternative, the district court ruled that the concluding sentence of the Distributor Information Exchange was a constitutionally-protected expression of opinion.[7] As the

---

4. The Distributor Information Exchange, a newsletter sent to Crawford's 78 distributors, appears roughly once a month. It is produced by a word processor and a photocopying machine. The "lead story" for October is reprinted here in its entirety:

   *Bi-Lok "Independent" Test*

   Bi-Lok distributors are regularly handing out copies of Test Results from tests performed (at Bi-Lok expense) at Newport News Shipbuilding & Dry Dock Company in Newport News, Virginia.

   These tests were commissioned and paid for by Ray McGarvey at Potomac V & F Co. He also furnished all of the tube fittings (including the Swagelok fittings).

   It all sounds very official until you read it in detail:

   1. Fittings were Bi-Lok and Swagelok, furnished by Potomac V & F. Question: Why did Potomac furnish the Swagelok fittings? Leads to many more questions.

   2. Of the 48 assemblies tested, "47 of 48 assemblies showed favorable results". Question: What happened to the 48th? Answer: It leaked.

   3. In helium leak test the column "VACUUM TO" is listed as greater than $1 \times 10^{-5}$ cc/sec helium. This is a leak rate, not a vacuum.

   4. No forged shapes were used in the tests.

   5. The make-break test assembly was not used for burst tests as we always do in our tests.

   6. Tensile tests merely said "increased load until union broke or tubing pulled out of union." No figures given.

   7. Only one wall thickness of tubing was used for each size.

   This was a (purposely) very poor test designed to snow the customer.

5. The defendants filed separate answers. Dibert Valve simply denied liability. Crawford, by contrast, brought a counterclaim for $3 million arising from a press release that Potomac Valve issued at the time it filed its complaint. When the district court granted the defendants' motion for summary judgment, the counterclaim was voluntarily withdrawn. It is not now before us.

6. The "common interest" privilege can be overcome only by proof of malice, and the district court held that "there has been no showing here of ... malice".

7. The district court did not deal explicitly with the August 26, 1985 letter from Dibert to Badische. It did find, however, that "the basic libelous document is the distributor information exchange". We interpret this as a finding that the Badische letter was simply not defamatory. Because we view the letter as an effort to question the applicability of the tests, rather than the motives of McGarvey and Potomac Valve, we agree. See note 3.

district court noted, either one of these alternative grounds for dismissing the defamation claim would apply to the Virginia "insulting words" statute as well. Finally, the court found no evidence of a conspiracy between Crawford and Dibert Valve. On appeal, the plaintiffs challenge the district court's judgment on all three counts.

## II.

■ A. We begin with the civil conspiracy count. Virginia law provides treble damages for anyone who is injured in his "reputation, trade, business or profession" by the concerted and malicious acts of two or more other persons.[8] Although the statute refers to "any means whatever", Virginia courts have consistently ruled that to recover damages for conspiracy a plaintiff must show that the defendants have combined "to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means". *Hechler Chevrolet, Inc. v. General Motors*, 230 Va. 396, 337 S.E.2d 744, 748 (1985). Thus, summary judgment against the plaintiffs on the conspiracy count must be affirmed unless the plaintiffs can point to specific facts showing that Crawford and Dibert Valve combined to use unlawful tactics to counteract the marketing effect of the Bi-lok test. *See Celotex Corp. v. Catrett*, 477 U.S. 317, ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986).

We find no evidence that the defendants combined to use unlawful means to blacken the plaintiffs' reputation. It is true that Dibert spoke to Wilson over the telephone about the Bi-lok test. He may even have encouraged Wilson to prepare a response. But the only evidence in the record concerning this conversation is that it ended on an inconclusive note: Wilson told Dibert that he had "more important things to do". Moreover, as we hold below, the response that Crawford finally issued was *not* in fact unlawful.

There is no genuine issue in this case as to the existence of a civil conspiracy, even when the record is viewed in the light most favorable to the plaintiffs. *Cf. United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). We therefore affirm the entry of summary judgment against the plaintiffs on the conspiracy count.

B. We now turn briefly to the plaintiffs' "insulting words" claim. Virginia Code § 8.01-45 creates a private cause of action against the use of words "which from their usual construction and common acceptance are construed as insults and tend to violence and breach of the peace".

■ Although application of this provision is no longer confined to its original purpose of preventing duels, it has been interpreted by Virginia courts to be virtually co-extensive with the common law action for defamation.[9] *W.T. Grant Co. v. Owens*, 149 Va. 906, 141 S.E. 860, 863 (1928); *see also Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 82 S.E.2d 588, 591 (1954); *Mills v. Kingsport Times-News*, 475 F.Supp. 1005, 1007 (W.D.Va.1979). For this reason we conclude that any constitutional limitations that apply to the plaintiffs' defamation action must necessarily apply to their "insulting words" claim as well. Put differently, we agree with the district court that in this case the defamation claim and the § 8.01-45 claim must ineluctably "rise or fall together".

---

**8.** Section 18.2-499 of the Virginia Code imposes criminal liability upon:

> (a) Any two or more persons who shall combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever....

Civil liability and the right to treble damages and attorney's fees are established in § 18.2-500.

**9.** The only remaining exception to this near-perfect congruence is that § 8.01-45 reaches statements made only to the plaintiff, while defamation requires that the actionable statement be communicated to some third party. *Carwile*, 82 S.E.2d at 591; *The Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 713, 720 n. 1, *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985). In this case, however, the distinction is irrelevant: the defendants' statements *were* communicated to third parties.

■ C. Finally, then, we address the plaintiffs' defamation claim. We are unable to accept the district court's first ruling that the record warrants summary judgment on the basis of the "common interest" privilege. William Wilson, the author of the Distributor Information Exchange, testified in his deposition that he fully expected the substance of his article to be passed along from the distributors to the salesmen—and eventually to the customers themselves. The plaintiffs presented some evidence that Swagelok salesmen were spreading the word that the Bi-lok test had been "purposely constructed to snow the customer". Letter of Don Chamberlain dated 10/29/85. If accepted by the court at trial, this evidence would severely undermine the "common interest" privilege. *See Great Coastal Express, Inc. v. Ellington,* 230 Va. 142, 334 S.E.2d 846, 853–54 (1985).[10] Because we hold that the privilege defense does not justify summary judgment in this case, we need not address the plaintiffs' contention that the defendants acted with malice.

■ We find, however, that the key statement in this case—that "[t]his was a (purposely) very poor test designed to snow the customer"—is, when read in proper context, a constitutionally protected expression of opinion.[11] Because the First Amendment line between fact and opinion is sometimes elusive, and because the issue has not yet been addressed in this circuit, we pause here to provide our understanding of the distinction before applying it to the facts of this case.[12]

The proposition that the First Amendment protects opinions from liability under state defamation law has often been traced to the following dictum in *Gertz v. Welch:*

> We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.

418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) (footnote omitted).[13] From these words, lower courts and commentators have gleaned at least three distinct rationales for giving special treatment

---

**10.** The district court appears to have been influenced by the fact that Crawford labeled the Distributor Information Exchange "Personal and Confidential". Ultimately, of course, it is the responsibility of the court to determine whether the "common interest" privilege applies in a given case. *Great Coastal Express,* 334 S.E.2d at 853; *Aylor v. Gibbs,* 143 Va. 644, 648, 129 S.E. 696, 697 (1925). Nevertheless, we reiterate that a summary judgment hearing is not the proper forum for assessing the relative weight of conflicting evidence. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985).

**11.** We have already ruled that the August 16, 1985 letter from Dibert to Badische was not defamatory. See note 7. None of the other statements attributed to Dibert constitutes defamation either. *See* Brief of Appellants at 13–14. We also agree with the district court's ruling that *only* the last sentence of the Distributor Information Exchange could possibly have defamed the plaintiffs. Indeed, the plaintiffs do not dispute the accuracy of the seven observations leading up to the final conclusion that the tests were "designed to snow the customer". Rather, they contend that the bulk of the article is irrelevant, and that the last sentence is a malicious *non sequitur.*

**12.** Whether a statement constitutes fact or opinion is a question of law for the trial court to decide. *Mr. Chow of New York v. Ste. Jour Azur S.A.,* 759 F.2d 219, 224 (2d Cir.1985); *Lewis v. Time, Inc.,* 710 F.2d 549, 553 (9th Cir.1983); *Rinsely v. Brandt,* 700 F.2d 1304, 1309 (10th Cir.1983). Like all questions of law, it is subject to *de novo* review on appeal.

**13.** Before *Gertz,* statements of opinion were often protected by the qualified common law privilege of "fair comment". *See* Restatement (Second) of Torts § 566 comment a (1977). The Supreme Court hinted as early as *New York Times v. Sullivan,* 376 U.S. 254, 292 n. 30, 84 S.Ct. 710, 732 n. 30, 11 L.Ed.2d 686 (1964) that the "fair comment" rule might have a constitutional dimension.

In Virginia, article 1, section 12 of the state constitution provides that "... any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right ...". Although we base our decision in this case on the federal right to free speech, we note that the Virginia Supreme Court has recognized and applied the fact/opinion distinction under article 1, section 12 of the Virginia Constitution as well. *Chaves v. Johnson,* 230 Va. 112, 335 S.E.2d 97, 101–02 (1985).

to statements of opinion. First, an idea that cannot be "false" generally cannot be proved to be "true" either. If actionable, then, statements of opinion would frequently lose the constitutionally-based protection of the truth defense.[14] Second, as a corollary to the Court's reliance upon "the competition of other ideas", it is widely recognized that an opinion carries less authority than a fact, and is therefore inherently less likely to threaten the interests and values that are safeguarded by laws against defamation.[15] Unpopular opinions, in the words of the Court, only "seem" to be pernicious.[16] Finally, the last sentence in the passage quoted from *Gertz* reminds us that most forms of speech have an *affirmative* constitutional value.[17] Ideas and opinions bear the personal imprint of the men and women who hold them. It is therefore particularly important to protect their unfettered expression, and a rule that chills statements of fact may be acceptable where a rule chilling opinions would not be.[18]

The constitutional distinction between fact and opinion is now firmly established in the case law of the circuits.[19] This Court recognized and applied it in *National*

**14.** *Cf. Ollman v. Evans*, 750 F.2d 970, 981–82 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). The Supreme Court's decision in *Garrison v. Louisiana*, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964) established the rule that truth is always a defense when the allegedly defamed party is a public official. In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975), the Court strengthened the constitutional footing of the truth defense. Nevertheless, the question whether true statements may *ever* be actionable under state defamation law apparently remains open. *But see Louderback v. American Broadcasting Companies*, 741 F.2d 193, 195 (8th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985); L. Tribe, *American Constitutional Law* 635 n. 22 (1977).

**15.** *Ollman*, 750 F.2d at 979, 981. *See also* Restatement (Second) of Torts § 566 comment c (the constitutional difference between fact and opinion "lies in the effect upon the recipient of the communication").

In the pre-*Gertz* case of *Greenbelt Cooperative Publishing Assn. v. Bressler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) the Supreme Court ruled that use of the word "blackmail" in connection with a developer's offer to sell land for the construction of a new school only in return for the re-zoning of some other property could not serve as the basis for a libel action:

It is simply impossible to believe that a reader who reached the word "blackmail" in either article would not have understood exactly what was meant: it was Bresler's public and wholly legal negotiating proposals that were being criticized. No reader could have thought that ... the newspaper articles ... were charging Bresler with the commission of a criminal offense.

*Id.* at 14, 90 S.Ct. at 1542. *Greenbelt* does not employ the fact/opinion distinction explicitly, but it does stand for the proposition that rhetorical or hyperbolic language is protected under the First Amendment because "even the most careless reader" can recognize it and discount its significance. *See also Mr. Chow of New York*, 759 F.2d at 229 (metaphors and hyperbole are entitled to constitutional protection when "the average reader would understand the statements involved to be opinion").

**16.** *Gertz*, 418 U.S. at 339, 94 S.Ct. at 3006. By stressing the comparative harmlessness of statements of opinion we do not mean to denigrate the importance of an individual's interest in his reputation. This interest has been fairly described as part of "the essential dignity and worth of every human being". *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring); *see also Gertz*, 418 U.S. at 341, 94 S.Ct. at 3007.

**17.** *See Bose Corp. v. Consumers Union*, 466 U.S. 485, 503, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502 (1984) ("The First Amendment presupposes that the freedom to speak one's mind is ... an aspect of individual liberty—and thus a good unto itself ..."); *see generally Whitney v. California*, 274 U.S. 357, 375, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring) ("Those who won our independence believed that the final end of the State was to make men free to develop their faculties.... They valued liberty both as an end and as a means.").

**18.** *See, e.g., Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir.), *cert. denied*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977) ("Any risk that full and vigorous exposition of opinion ... may be stifled must be given great weight").

One important aspect of the right to express one's opinion is protection of an author's decision to "interject style" into his writing. *Mr. Chow of New York*, 759 F.2d at 229. As this circuit observed in the pre-*Gertz* case of *Time, Inc. v. Johnston*, 448 F.2d 378, 384 (4th Cir. 1971), "[t]o deny the press the right to use hyperbole ... would condemn the press to an arid, desiccated recital of bare facts".

**19.** *See, e.g., Ollman v. Evans*, 750 F.2d at 974 n. 6 ("a majority of federal circuit courts ... have accepted the statement as controlling law").

*Foundation for Cancer Research v. Council of Better Business Bureaus, Inc.,* ("*NFCR*"), 705 F.2d 98, 100–01 (4th Cir.), cert. denied, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). We held that a statement that the plaintiff did not spend "a reasonable percentage of total income on program services" was an opinion, and therefore not actionable. *Id.* at 101. Although this determination is plainly correct, the *NFCR* opinion does not attempt to provide guidance for drawing the line in closer cases.[20]

Perhaps the most comprehensive attempt to define the indicia of an "opinion" can be found in *Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) (en banc). The *Ollman* case arose from a newspaper column that accused the plaintiff of being a Marxist pamphleteer and an activist rather than a serious scholar. Although the case engendered seven separate opinions, the opinion by Judge Starr for the Court held that the column was a constitutionally protected expression of opinion.

In reaching this conclusion, the *Ollman* court was admittedly sailing through the "largely uncharted seas ... left in *Gertz* 's wake". *Id.* at 977. Recognizing that it would be impossible to draw a bright line between fact and opinion, the court proposed a four-factor analysis. *Id.* at 979–84. To identify an opinion, a trial judge should (1) consider the author or speaker's choice of words;[21] (2) decide whether the challenged statement is "capable of being objectively characterized as true or false";[22] (3) examine the context of the challenged statement within the writing or speech as a whole;[23] and (4) consider "the broader so-

---

**20.** The plaintiff in *NFCR* complained about further statements by the defendant suggesting that the plaintiff's 1980 fund raising appeals had been "inaccurate and misleading". *Id.* at 99. Depending upon their exact language and context, these statements were arguably also opinions, a possibility the Court chose not to address. Instead, the *NFCR* court relied upon the "public figure" status of the plaintiff and the absence of actual malice to affirm the dismissal of defamation claims based upon these additional statements. *Id.* at 101–02.

**21.** *Id.* at 979–81. In other words, the district court must consider whether the defamatory terms have precise meaning, *see, e.g., Cianci v. New Times Publishing Co.,* 639 F.2d 54, 63 (2d Cir.1980), or, on the contrary, whether they are "loosely definable" and "variously interpretable", *see, e.g., Buckley v. Littell,* 539 F.2d 882, 895 (2d Cir.1976), cert. denied, 429 U.S. 1062, 97 S.Ct. 785, 50 L.Ed.2d 777 (1977). On a different plane, the trial court should decide whether the language in question is objective in tone, or "exaggerated or hyperbolic", *see, e.g., Mr. Chow of New York,* 759 F.2d at 228. Loosely definable language may leave the defendant without a truth defense; exaggerated language will be discounted by the listener or reader: these traits suggest that a statement is constitutionally protected opinion. *See generally McCabe v. Rattiner,* 814 F.2d 839, 842 (1st Cir.1987) (timeshare condominium development described as a "scam"); *Lauderback v. American Broadcasting Companies, Inc.,* 741 F.2d 193 (8th Cir.1984) (insurance agent referred to as a "crook"); *Lewis v. Time, Inc.,* 710 F.2d 549 (9th Cir.1983) (lawyer said to be one of the profession's "shadier practitioners"); *Edwards v. National Audubon Society,* 556 F.2d 113 (2d Cir.), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) (scientist called a "liar" for supposedly misusing Audubon statistics).

**22.** *Ollman,* 750 F.2d at 981–82. *See also Hotchner v. Castillo-Puche,* 551 F.2d at 913; Restatement (Second) of Torts § 566 comment a. Although it will sometimes be difficult to decide whether a given statement is verifiable, the inquiry must be pursued in the light of common sense. Perhaps in an effort to avoid conflict among the various *Ollman* factors, a few courts have chosen to "interpret" the defendant's statements before deciding whether they are verifiable. We regard this as a dangerous enterprise. In *Mr. Chow of New York,* for example, the court held that a restaurant reviewer's assertion that the sweet and sour pork at the plaintiff's restaurant contained "more dough than meat" really meant that "the pork was too doughy". Similarly, the statement that "[t]he green peppers ... remained still frozen on the plate" really meant that "the peppers were too cold". 759 F.2d at 229. Thus construed, each statement became an unverifiable "matter of personal taste". We agree that the language and context of the statements at issue in *Mr. Chow of New York* indicate that they are opinions; to suggest that they are inherently unverifiable, however, is to risk slipping into what Judge Friendly aptly referred to as "Humpty-Dumpty's use of language". *Cianci v. New Times Publishing Co.,* 639 F.2d at 64.

**23.** *Ollman,* 750 F.2d at 982–83. *See also* Restatement (Second) of Torts § 566 comment b. The *Ollman* court correctly notes that the Supreme Court's decision in *Greenbelt Publishing* serves as an example of "the power of context to transform an ostensibly factual statement into one of opinion". *Id.* at 982. The word "black-

cial context into which the statement fits".[24] We agree that this thoughtfully elaborated list includes all the relevant factors. Unfortunately, though, the *Ollman* test and other tests like it leave considerable doubt as to the proper outcome when all of these factors are not in agreement.[25]

We view the second *Ollman* factor—the verifiability of the statement in question—as a minimum threshold issue. If the defendant's words cannot be described as either true or false, they are not actionable, even if they are cautiously phrased and published in a learned treatise. The statement in *NFCR* that the plaintiff failed to invest a "reasonable percentage" of its income in actual cancer research was inherently impossible to prove or disprove. As such, it was properly protected by the First Amendment, regardless of how it might have fared under the full *Ollman* analysis.

Even when a statement is subject to verification, however, it may still be protected if it can best be understood from its language and context to represent the personal view of the author or speaker who made it.[26] Thus we reject the suggestion, advanced by the plaintiffs in this case, that any "question of fact" which can be decided by a jury can be actionable as defamation. Such a test ignores the underlying purposes of the fact/opinion distinction, and would lead to results that could not be reconciled with the developing case law in other circuits.[27]

We hold that a verifiable statement, a statement that has failed the second *Ollman* factor, nevertheless qualifies as an "opinion" if it is clear from *any* of the three remaining *Ollman* factors, individually or in conjunction, that a reasonable reader or listener would recognize its weakly substantiated or subjective character—and discount it accordingly. As Thomas Jefferson observed in his first Inaugural Address, in a passage quoted by

mail", taken out of context, might easily appear to refer to specific criminal activity. Read as a whole, however, the article at issue in *Greenbelt Publishing* provided the reader with enough background information to realize that the term "blackmail" was only being used to criticize the plaintiff's bargaining position. See note 15.

**24.** *Ollman,* 750 F.2d at 983–84 ("[i]t is one thing to be assailed as a corrupt public official by a soap box orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service"); *see also* Restatement (Second) of Torts § 566 comment e (1977). Authority for this factor is often drawn from *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). In *Letter Carriers,* a union newsletter described the plaintiffs as "scabs" and added that "a SCAB is a traitor to his God, his country, his family and his class". *Id.* at 268, 94 S.Ct. at 2773. Although the case was decided under federal labor law, rather than the First Amendment, the Supreme Court relied upon *Gertz* for the proposition that opinions cannot serve as the basis for libel claims. *Id.* at 284, 94 S.Ct. at 2781. The statement was an opinion, the Court concluded, because "such exaggerated rhetoric [is] commonplace in labor disputes". *Id.* at 286, 94 S.Ct. at 2782.

**25.** In *Mr. Chow of New York,* see note 18, the Second Circuit consolidated the four *Ollman* factors into three by combining the last two

under the single heading of "context". Because restaurant reviews are "the well recognized home of opinion and comment", 759 F.2d at 227, the "context" factor cut in favor of ruling that the entire review was opinion. Nevertheless, the court distinguished criticism of the Peking Duck (fact) from criticism of the peppers and the sweet and sour pork (opinion) on the basis of the defendant's choice of language. *Id.* at 229. This implicitly suggests a rule that unless *all* of the *Ollman* factors point toward "opinion", the statement in question is a "fact". We would reject such a rule as unnecessarily rigid. See note 33.

**26.** We agree that a test hinging exclusively on whether an average reader would perceive the statement as an opinion, *see, e.g., Mashburn v. Collin,* 355 So.2d 879, 885 (La.1977), is inadequate. *See Ollman,* 750 F.2d at 979 n. 16. Nevertheless, by adopting this formulation, the *Mashburn* court rightly focuses on one of the main purposes of the fact/opinion distinction: to give immunity to statements that are recognizable as opinions, and thus likely to be taken with a grain of salt.

**27.** *Cf. Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302 (8th Cir.) (en banc), *cert. denied,* —— U.S. ——, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986) ("the term 'fact' need not have the same meaning in every legal context. The meaning we give to it should depend on the purposes of the law being applied").

Justice Powell in *Gertz,* error of opinion need not and ought not be corrected by the courts "where reason is left free to combat it".[28]

■ Applying this analysis to the case before us, we begin by asking whether the final sentence in the Distributor Information Exchange is capable of truth or falsity. The plaintiffs argue that the test was either "purposely ... designed to snow the customer" or it wasn't.[29] We agree. The truth or falsity of the statement does not depend upon subjective values or indefinite terms. *Cf. Avins v. White,* 627 F.2d 637, 642–43 (3d Cir.), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (statement that "academic ennui" pervaded plaintiff's law school not actionable).

■ In oral argument before the district court, the defendants suggested that statements of intention or motive are inherently unverifiable. According to the defendants, "many psychiatrists" would maintain that "we often even don't know our own intentions". We emphatically reject this approach. The question of verifiability is ultimately relevant only insofar as it preserves the truth defense and protects statements which the ordinary reader or listener would recognize as incapable of positive proof. These purposes are *not*

served by considering psychological and epistemological doubts that would ultimately threaten the entire concept of defamation. We hold that the final sentence of the Distributor Information Exchange is capable of being proved true or false.[30]

We proceed, then, to the second step of the analysis. Here we consider the language of the statement in question, the context of the statement within the article as a whole, and the broader social context within which the statement was made.[31] The plaintiffs would have us find that the message of the Distributor Information Exchange was that Mr. McGarvey acted with "specific intent" to "mislead" his customers. We note, however, that the Distributor Information Exchange does not use these precise, legalistic terms. Instead, Mr. Wilson set the word "purposely" in parenthesis, as though it were an afterthought, and used the colloquial verb "to snow". We do not doubt that "to snow" has an ascertainable and pejorative meaning. Nevertheless, it lacks the air of illegality which hangs about the words "mislead", "deceive", and "defraud".[32]

The district court ruled that the statement was opinion based upon the next factor, its context in the article as a whole.[33] The plaintiffs prefer to discuss

---

**28.** *The Complete Jefferson* 385 (S. Padover ed. 1943), *quoted in Gertz v. Welch,* 418 U.S. at 340, n. 8, 94 S.Ct. at 3007 n. 8.

**29.** The defendants' argument on this point is often clouded by their reluctance to acknowledge that the Distributor Information Exchange criticizes the plaintiffs' intentions. It is true, of course, that the statement "[t]his was a (purposely) very poor test ..." also offers a judgment of the test itself. We agree with the defendants that this second judgment is too loosely worded to be verifiable. The plaintiffs' main concern, however, is the imputation of bad faith contained in the words "purposely ... designed to snow the customer".

**30.** Counsel for the defendants have also argued that the statement is entirely true. This argument addresses an issue we need not reach in this opinion. In holding that the final sentence in the Distributor Information Exchange article is capable of truth or falsity we have given no weight to Dibert and Crawford's defense of its truth. Men have often argued for and against unprovable assertions; we find no logical correlation between the existence of these arguments

and the provability of the underlying assertion. *But cf. Kelly v. Schmidberger,* 806 F.2d 44, 48 (2d Cir.1986).

**31.** We discuss these three factors separately. Once the issue of verifiability has been isolated as a threshold concern, however, we find nothing objectionable in the "totality of the circumstances" approach advocated by Judge Bork. *Ollman v. Evans,* 750 F.2d 970, 993 (Bork, J., concurring).

**32.** The exact language used in a statement will often carry great importance. *See e.g., Ollman v. Evans,* 750 F.2d at 1000 n. 5 (Bork, J., concurring) ("Marxist" distinguished from "Leninist" and "Communist-fronter"); *Edwards v. National Audubon Society,* 556 F.2d at 121 ("liar" distinguished from "paid liar").

**33.** Although we base our affirmance upon the combined effect of the first, third, and fourth *Ollman* factors, we note that there is authority to support the district court's decision to rely upon a single factor. *Edwards v. National Au-*

the last sentence of the article in isolation. Standing alone, the statement that McGarvey purposely designed the test to snow his customers might well suggest that the author had special access to information that confirmed McGarvey's bad faith.[34] Read in context, however, it is clear that the statement is merely Wilson's conclusion from the seven specific points he outlines in the text of the article.

We note in particular the sentence: "It [the Bi-lok test report] all looks very official until you read it in detail". This sentence puts the reader on notice that the author is basing his discussion on nothing more than a close analysis of the test results. The paragraph that begins with this sentence proceeds to list a number of methodological shortcomings that are supposedly revealed by a close reading of the test results, and ends with the conclusion that the test was purposely designed "to snow the customer". We agree with the district court that, when properly viewed in context, the statement in question readily appears to be nothing more than the author's personal inference from the test results. The premises are explicit, and the reader is by no means required to share Mr. Wilson's conclusion.

Finally, we find that a reasonable reader would recognize that the contents of the Crawford Distributor Information Exchange are likely to reflect the professional interests of the Crawford Fitting Company. The plaintiffs point out that the statement "was published in a distributor *informa-*

*tion* exchange and not in an *opinion* exchange" (original emphasis). Despite the label of the publication, however, we are unable to agree with the suggestion that readers of the bulletin—whether distributors or potential customers—would expect it to contain a dispassionate and impartial assessment of the Bi-lok test.[35] The world of business is a world of conflict and competition. Businessmen recognize this, and are usually able to discount the views of one competitor about the quality of his rival's product, or the purity of his ethical character.[36]

In summary, we acknowledge that the defendants' statement is capable of being proved or disproved, but we nevertheless hold that when viewed in context it is clearly an opinion, and therefore protected by the First Amendment. For this reason, we agree with the district court's disposition of both the "insulting words" claim and the defamation count.

Accordingly, the judgment of the district court is AFFIRMED.

---

*dubon Society,* 556 F.2d at 121. *But cf. Janklow v. Newsweek,* 788 F.2d at 1302.

**34.** A "negative characterization" will be actionable if it is "coupled with a clear but false implication that the author is privy to facts … that are unknown to the general reader". *Hotchner v. Castillo-Puche,* 551 F.2d at 913; *see also Lauderback v. American Broadcasting Companies,* 741 F.2d at 195. In the present case, there is no suggestion in the Distributor Information Exchange that the author has access to facts that are not disclosed in the Bi-lok test synopsis.

**35.** Although only one number of the Distributor Information Exchange appears in the record,

we note that the other major "article" for October 1985 is devoted to a discussion of why Crawford's "TFE Tape" is superior to other brands.

**36.** The plaintiffs have based their case upon alleged injuries to their reputation within the business community. Even if members of the general public somehow learned of Crawford's low opinion of the Bi-lok test, it is difficult to see how this knowledge could have damaged the plaintiffs. Thus the "reasonable reader" we envision is endowed with the business sophistication of a reasonable purchaser of pipe fittings.